**Narine Mkrtchyan, Esq. (SBN 243269)**
**MKRTCHYAN LAW**
655 N. Central Ave, Suite 1700
Glendale, CA 91203
Telephone:    (818) 388-7022
Web:          www.narinelaw.com
Email:        narine57@gmail.com

Attorney for Plaintiff Rachel Nazarian

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHEL NAZARIAN,<br><br>              Plaintiff,<br><br>vs.<br><br>CITY OF BEVERLY HILLS, BEVERLY HILLS POLICE DEPARTMENT CHIEF SANDRA SPAGNOLI, individually and in her official capacity, OFFICER STEPHANIE NGUYEN-LIEU #04839, individually and as a peace officer, OFFICER MICHAEL DOWNS, individually and as a peace officer, OFFICER AARON MORI, individually and as a peace officer, OFFICER ALEXANDER RHEE, individually and as a peace officer, OFFICER CONTRERAS, individually and as a peace officer, and DOES 1-10.<br><br>              Defendants. | No. CV<br><br>**COMPLAINT FOR DAMAGES**<br><br>1.  Violation of Civil Rights<br>     (42 U.S.C. §1983)<br>2.  *Monell* Claim<br>     (42 U.S.C. §1983)<br><br><br>**DEMAND FOR JURY TRIAL** |

**JURISDICTION**

1.     Jurisdiction of this court is invoked under 28 U.S.C. §§ 1343, (1), (2), (3) and (4). This action at law for money damages arises under Title 42 U.S.C. Section 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the Fourth, and Fourteenth Amendments of the United States Constitution.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

2.     At all times herein mentioned, Plaintiff RACHEL NAZARIAN was a 72-year old

2

Iranian-American resident of the County of Los Angeles, City of Beverly Hills.

3.      At all times herein mentioned, Defendants CHIEF SANDRA SPAGNOLI, STEPHANIE NGUYEN-LIEU, MICHAEL DOWNS, AARON MORI, ALEXANDER RHEE AND CONTRERAS (unk first name) and DOES 1-10, inclusive and each of them, were employees of the CITY OF BEVERLY HILLS, and the BEVERLY HILLS POLICE DEPARTMENT.

4.      Defendant CITY OF BEVERLY HILLS (hereinafter referred to as "CITY") is and at all times herein mentioned has been a public entity and an incorporated city duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant CITY has possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the BEVERLY HILLS POLICE DEPARTMENT, (BPD) and particularly said Department's Patrol, Internal Investigations and Training and Personnel Divisions and other operations and subdivisions presently unidentified to Plaintiff, and their tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, the use and deployment of dangerous weapons, the use of force, and powers of arrest by its rank and file. Defendant CITY and BPD have employed CHIEF SANDRA SPAGNOLI as chief since March 2016. At all times herein mentioned CHIEF SANDRA SPAGNOLI was responsible for setting and enforcing the policies, customs and practices of BPD.

5.      Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged.   The true names and capacities of DOES 1 through 10, inclusive, and each of

them, are not now known to Plaintiffs who therefore sues said Defendants by such fictitious

names and will be added to this action as provided by California Code of Civil Procedure Section

484 and FRCP Section 15.


6.     Defendants, and each of them, did the acts and omissions hereinafter alleged in

bad faith and with knowledge that their conduct violated well established and settled law.


7.     On December 10, 2017 at around 5 am 72-year old Plaintiff RACHEL

NAZARIAN was sleeping alone in her apartment, #307 in a small three-story building at 170 N.

Crescent Drive in the City of Beverly Hills, when she was awakened by a loud banging on her

door. Half asleep, half awake and in fear, she approached the door, thinking she was being

burglarized, as it had happened recently before. She could barely ask, 'Who is it?' when she

heard 'Shut up! Open the door! If you don't open it, we will break in!' As she was trying to

figure out what was going on, hesitating to open the door and asking 'What is happening? I don't

know who you are! I am alone here!' rapidly breathing from fear, the door was crashed open,

jamming her foot and multiple police officers raided her home. In terror, she was immediately

grabbed violently and handcuffed in a rude manner injuring her arms and shoulders, and dragged

out of her apartment to the hallway and thrown to sit by the wall, while neighbors were watching

and screaming, 'What has she done? Why are you doing this? It is not this apartment!' Injured

and weakened from handcuffs, RACHEL was getting a panic attack, while Defendants

NGUYEN-LIEU, DOWNS, MORI, RHEE AND CONTRERAS entered her apartment and

searched it. Not finding what they were looking for and realizing they raided the wrong

apartment, they continued holding RACHEL in handcuffs seated on the cold floor of the

hallway, in view of neighbors, while getting a full-blown panic attack, sobbing and unresponsive to comments or questions. Gathered neighbors were telling the Defendants, 'You are in the wrong apartment! She is an old lady. Why are you treating her like that?' But they were also treated aggressively, not allowed to approach and comfort RACHEL, told to shut up and go inside their rooms.

Defendants then kept RACHEL in handcuffs behind her back for an extended period of time causing her injuries and detaining her unlawfully, with knowledge they were in the wrong place. They were in RACHEL's apartment for about three hours while RACHEL was under the arrest and custody of the Defendants. A supervisor was summoned to the scene eventually and RACHEL was treated by arriving paramedics for a rapid heart rate. Under the demands of neighbors and her arriving family, the supervising sergeant agreed to coordinate the repairs of the broken door and took pictures of RACHEL's visible injuries. However, none of the neighbors were interviewed by the arriving supervisor to gather the true facts and put them down in the report, in an effort to cover-up the subordinates' actions, in accordance with the long-standing customs, policies and practices of the City of Beverly Hills.

Defendants then reached a quick meeting of the minds in trying to cover-up their wrongdoing by intentionally misrepresenting the true facts. Defendant NGUYEN-LIEU wrote a case report (No. 2017-0061628) where she claimed she was dispatched on a radio call for a 'yelling heard.' As she arrived, she claimed she spoke with the Reporting Party Maria Incaarellano, a resident in the building, who told her she heard a woman screaming from somewhere, either from inside her building, or outside. Defendant NGUYEN-LIEU then claims she went down to investigate and parked in the alley, heard a loud scream, saw a glass breaking

and falling out the window. A well-trained and reasonably diligent police officer investigating a disturbance would pay attention which floor/apartment the glass broke from in a small three-story building. Falsely claiming, the glass was breaking from a window on the third floor, she rushed to the building, summoned Defendants DOWNS, MORI, RHEE AND CONTRERAS to the third floor, RACHEL's apartment. She willfully omitted from the report that Defendants had been knocking on doors of apartment residents on the third floor, and neighbors were telling them they had not heard any noise from their floor, but there was a mentally disturbed woman residing on the second floor and probably the noise was coming from there and they should be going in that direction. Indeed, the Beverly Hills Police Department had been dispatched to the building previously for disturbance caused by a mentally ill resident from the second floor. The Defendants were extremely rude and aggressive to the neighbors and ignored their comments, ordering them to go inside. Some neighbors however, managed to watch in shock as the bizarre incident unfolded, something they had seen only on TV. Defendant NGUYEN-LIEU with the assistance of Defendants DOWNS, MORI, RHEE AND CONTRERAS in concert decided nevertheless to raid RACHEL's apartment, search it and detain her unlawfully using brutal force in dragging her out and handcuffing her. When they approached the door of RACHEL's apartment with neighbors peeping out of their doors, they did not hear any noise or sign of ongoing trouble. RACHEL answered them in a meek voice, neither screaming nor yelling. Defendant NGUYEN-LIEU however, falsely claims in her report RACHEL repeatedly was told to open the door, and was told it was the police department and she refused. Neighbors told Defendants that there was an old lady living there who was never causing trouble. RACHEL's momentary hesitation to open the door was not well-taken and the break-in was almost

immediate, which is proven by the fact that when the door was broken, RACHEL's foot was jammed, as she had no opportunity to walk away from the door. She was not in a position to protect herself from intrusion because of how quickly the Defendants decided to break in. Further shocked by the intrusion, she could offer no resistance and yet was placed in handcuffs and thrown by the wall.

As Defendant NGUYEN-LIEU further claims that Defendant DOWNS announced to the woman inside to step away from the door as he was about to kick it down. No such announcement was given. After forceful kick-in according to the case report by Defendant NGUYEN-LIEU, Defendant RHEE handcuffed RACHEL, while Defendants CONTRERAS, DOWNS and NGUYEN-LIEU searched the residence with negative results. No signs of broken glass, or any trouble was found in the apartment. Yet Defendants in concert kept RACHEL in handcuffs getting a panic attack from pain and fear, seated on the cold floor of the hallway, in their violent custody, until they figured out as neighbors had told them, it was a second-floor apartment where the disturbance was occurring. The glass had broken from a second-floor window not even close to RACHEL's windows and it was objectively unreasonable to break into RACHEL's apartment merely because she hesitated to open the door instantly. Had the Defendants truly believed the disturbance was specifically coming from RACHEL's apartment, they would not have knocked and checked-in at other doors on her floor before approaching her door. It was further brutal to keep an elderly and sobbing woman in handcuffs on the hallway floor, after realizing they had just raided the wrong apartment because it took seconds for five police officers to determine there was no broken glass anywhere in the small apartment. In her report, NGUYEN-LIEU admits that RACHEL was still being kept in handcuffs, under their

7

functional arrest, while they were continuing to investigate the true cause of disturbance. She willfully omitted to mention the injuries sustained by RACHEL by their rude force and aggression and summarized the incident under the rubric of Property Damage. Only after Defendants under the leadership of NGUYEN-LIEU finished their investigation of the disturbance caused on the second floor, Defendant DOWNS was ordered to unhandcuff RACHEL, who was at this time unresponsive to comments or questions. Paramedics were dispatched to treat RACHEL, who was breathing rapidly.

Defendants DOWNS, MORI, RHEE AND CONTRERAS in a collusive effort to cover-up their wrongdoing, did not bring out true facts to the arriving Sergeant Fair, nor did they correct material misstatements and omissions from the report by NGUYEN-LIEU when they had the opportunity and duty to do so. Each of the defendants knew and understood the report by NGUYEN-LIEU was fabricated and exclusion of exculpatory facts was designed to shield them from their misconduct and incompetence at the expense of detaining, injuring and arresting RACHEL in violation of her constitutional and statutory rights.

RACHEL then retained an attorney to file a state law tort claim for damages on May 1, 2018, which was denied on August 2, 2018. Through her lawyer she filed a formal citizen complaint by a letter directed to Defendant CHIEF SANDRA SPAGNOLI on March 28, 2018. The Professional Standards Unit of the BPD was assigned to investigate the complaint on April 6, 2018. RACHEL was not interviewed by the Unit and on April 25, 2019 she was informed in writing that the Professional Standards Unit finished their token investigation and all Defendants were fully exonerated of any wrongdoing. None of the Defendants have been disciplined and the BPD and the City of Beverly Hills formally ratified their egregious misconduct and brutal police

8

practices.

RACHEL sustained injuries to her foot, arms and shoulders, lasting anxiety, insomnia and great deal of emotional distress, pain, mental anguish, humiliation and suffering as a result of the misconduct by the Defendants and customs, policies, practices of the City of Beverly Hills. She further sustained loss of wages and other economic damages as a proximate result of Defendants' actions.

## FIRST CAUSE OF ACTION
### (VIOLATION OF CIVIL RIGHTS – UNREASONABLE SEARCH AND SEIZURE, EXCESSIVE FORCE, FALSE ARREST, CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS - 42 U.S.C. § 1983)

### (By Plaintiff Against All Individual Defendants)

8.     Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 7 of this complaint, and by this reference incorporate the same herein and make each a part hereof.

9.     This action at law for money damages arises under Title 42 U.S.C. § 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the Fourth, and Fourteenth Amendments of the United States Constitution.

10.     Commencing at or about the aforementioned date and place, without cause or justification, and acting under color of law, Defendants NGUYEN-LIEU, DOWNS, MORI, RHEE AND CONTRERAS and DOES 1-10, inclusive and each of them, intentionally and

maliciously deprived Plaintiff of rights secured to her by the Fourth, and Fourteenth Amendments to the United States Constitution in that Defendants and each of them, subjected Plaintiff to unreasonable detention, unreasonable search, unreasonable force and de facto arrest without probable cause.

11.     The aforementioned acts and omissions were committed in accordance with widespread policies, practices and customs maintained by CITY, BPD AND CHIEF SPAGNOLI as elaborated hereinafter at paragraphs 18-23.

12.     Defendants, and each of them, quickly and spontaneously reached meeting of minds to carry out and perpetrate the mutually supportive conspiracy to deprive Plaintiff of her rights by participating in a corrupt effort to illegally seize, search and arrest Plaintiff without probable cause.

13.     As a proximate result of the aforesaid acts and omissions of Defendants, and each of them, Plaintiff sustained great physical and mental pain and shock to her nervous system, fear, anxiety, torment, degradation and emotional distress.

14.     By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiff incurred medical and therapeutic expenses in an amount as proved.

15.     In addition, by reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiff was kept from attending to her usual occupations, and has suffered loss and impairment of earnings and employment opportunities all to her damage in an amount as proved.

16.     By reason of the aforementioned acts of Defendants, and each of them, Plaintiff

was compelled to secure the services of an attorney at law to redress the wrongs hereinbefore mentioned and by virtue thereof, Plaintiff is indebted and liable for attorney's fees.

17.     The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully and maliciously, with the intent to harm, injure, vex, harass and oppress Plaintiff with a conscious disregard of Plaintiff's constitutional rights and by reason thereof, Plaintiff seeks punitive and exemplary damages from Defendants, and each of them, (except Defendant CITY) in an amount as proved.

## SECOND CAUSE OF ACTION

### (UNLAWFUL CUSTOM AND PRACTICE UNDER SECTION 1983)
### (By Plaintiff Against Defendant CITY and CHIEF SPAGNOLI)

18.     Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 17 of this complaint, and by this reference incorporate the same herein and make each a part hereof.

19.     Defendant CITY is and at all times herein mentioned has been a public entity and an incorporated municipality duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant CITY, possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the BPD and its tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, and the proper uses of force by its rank and file, generally. As the CHIEF of BPD, Defendant SANDRA SPAGNOLI had power and authority to set and enforce the policies and rules promulgated by Defendant CITY.

20.     At all times herein mentioned, Defendants, and each of them, were employees

acting under the CITY'S direction and control, who knowingly and intentionally promulgated, maintained, applied, enforced and suffered the continuation of policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendments respectively to the United States Constitution, which customs, policies, practices and usages at all times herein mentioned required and encouraged the employment, deployment and retention of persons as peace officers who have demonstrated their brutality, dishonesty, bigotry, and numerous other serious abuses of their powers as peace officers in the employment of the CITY and BPD.

21.     Defendant CITY and CHIEF SPAGNOLI knowingly maintains and permits official *sub-rosa* policies or customs of permitting the occurrence of the kinds of wrongs set forth above, by deliberate indifference to widespread police abuses, failing and refusing to impartially investigate, discipline or prosecute peace officers who commit acts of felonious dishonesty and crimes of violence, each ratified and approved by CITY, BPD, and CHIEF SPAGNOLI.

22.     The unconstitutional policies, practices or customs promulgated, sanctioned or tolerated by Defendants CITY, BPD AND CHIEF SPAGNOLI include, but are not limited to:

(1)     Defendant CITY, BPD and CHIEF SPAGNOLI had knowledge, prior to and since this incident, of repeated allegations of abuse and assaultive misconduct toward detainees and arrestees and refused to enforce established administrative procedures to insure the safety of detainees and arrestees. Specifically, CITY, BPD and CHIEF SPAGNOLI knew Defendants NGUYEN-LIEU, DOWNS, MORI, RHEE AND CONTRERAS and DOES 1-10, inclusive and each of them, had in the past committed acts of police abuse, dishonesty and prevarication against members of the public, most of them members of protected minority classes;

12

(2)      Defendant City, BPD and CHIEF SPAGNOLI had knowledge, prior to this incident, of the incident on November 11, 2017 when the Defendants NGUYEN-LIEU and DOWNS unlawfully arrested Emmanuel Sandoval (Hispanic) and Princeton Legree (African-American) on false accusations of insurance fraud after an auto collision where Sandoval was struck and injured by an automobile. Defendants thereafter failed to prepare and provide an accident report and defendant City refused to provide a copy of the police report to Plaintiffs. Report of the unlawful arrest was transmitted by BPD to Sandoval's employer, LAUSD, causing his termination. The BPD further failed to retain potential video recording of the incident that would have exonerated the Plaintiffs. (Sandoval et al. v. City of Beverly Hills, et al. Case No. BC708428, LA Superior Court).

(3)      Other similar examples include the unlawful detention and arrest in March 2015 by BPD officers of Brian Goldberg, the President of the Beverly Hills Unified School District, as retaliation for his exposure of BPD's corrupt practices and pay-offs to the BPD by a private security company to get a contract. With knowledge of his status and lack of criminal history, the BPD held him in custody on a misdemeanor battery and did not offer him a release under Cal. PC 853.6. The BPD officers initiated the arrest and detention of Goldberg with knowledge that the complaint was fabricated. (Goldberg v. City of Beverly Hills, et al. Case No. BC653089; 2:17-cv-09226-AB-GJS; https://www.courthousenews.com/ex-school-boss-accuses-beverly-hills-cops-vendetta/)

(4)      Similarly, BPD officers, unlawfully arrested and detained Plaintiff Hollywood on felony charges in March 2014 on false accusations and fabricated reports. BPD officers with knowledge of true facts and circumstances, destroyed exculpatory evidence and booked Plaintiff Hollywood with fabricated probable cause declaration. BPD officers were aware of the witness statements, 911 audio recording and video surveillance that exonerated Plaintiff of criminal charges and maliciously conspired to destroy that evidence and not retain it for purposes of criminal prosecution in violation of *Brady*. (Hollywood v. City of Beverly Hills,

<u>et al</u>. Case No. 2:17-cv-02450-JGB-GJS)

(5)        Similarly, BPD officers under CHIEF SPAGNOLI, falsely arrested, detained and subjected to excessive force married couple Rachel Clentworth and Geoffrey Maddock in July 2015. The couple was driving in the city when the BPD officers made a high-risk felony stop, with guns drawn, dogs barking. The couple was ordered out of the car, without being told the reason for the stop, tightly handcuffed, made to sit in a patrol car without A/C with closed windows, then on the curb in the July heat. After a prolonged detention and search of their belongings without a warrant, where they were subjected to excessive force, humiliation, fear, they were told they were detained on a suspicion of gift card fraud based on a generic report by CVS pharmacy after an entirely legal purchase by the couple. (<u>Clentworth et al. v. City of Beverly Hills, et al.</u> 2:16-cv-05501-RGK-SS)

(6)        Similarly, BPD officers unlawfully searched and seized Gary Klein on false accusations of his wife's murder in 2009 without any legal basis and/or evidence. In the period of 2009-2011 the BPD officers continuously harassed, threatened, intimidated and subjected Plaintiff Klein and his family to a bogus criminal investigation by multiple unlawful raids/searches of his and his family homes, seizures and interrogations. After he complained to the Internal Affairs of BPD, no action was taken to investigate or solve the problem. (<u>Klein v. City of Beverly Hills, et al</u>. 2:13-cv-00110-JFW-VBK)

(7)        Similarly, BPD officers unlawfully seized and arrested Karl Huber in April 2011 at his own apartment. His girlfriend was accosted by a BPD officer in the apartment hallway and when she dialed 911 to report the assault, she was further detained and assaulted by the BPD officers who forcefully followed her into the apartment without a warrant, by breaking the door. When Karl Huber asked them for a warrant, they viciously and maliciously attacked, brutalized and arrested him on false charge of resisting police. He was then maliciously prosecuted by BPD officers after they falsified probable cause declaration and police report until the case was dismissed by the criminal judge. (<u>Huber v. City of Beverly</u>

14

Hills, et al. 2:12-cv-03293-GHK-JEM).

(8)        BPD officers similarly unlawfully detained and arrested African-American

television producer Charles Belk in August 2014, as he was walking towards his car. He was

detained for four hours, denied the right to a phone call, and made to sit on the curb in

handcuffs. He was mistakenly identified as a bank robber. Had the BPD timely reviewed the

footage of the robbery, he would not have been detained that long.

(https://www.afro.com/beverly-hills-police-apologize-for-wrongful-arrest-of-prominent-

black-film-producer/)

(9)        Defendant CITY and BPD employed and retained Defendant CHIEF SPAGNOLI

with knowledge as of December 2016 she had been a subject of multiple complaints/lawsuits

by employees for discrimination, harassment and/or retaliation, and by citizens for egregious

civil rights violations at different police departments in her capacity both as a peace officer

and chief. Civil rights allegations against Defendant CHIEF SPAGNOLI included inadequate

training/supervision and refusal to enforce well-established policies, that continued through

her tenure at BPD. Defendant City and BPD failed to do proper background investigation

under Cal. Gov. Code §1031 and ratified the repeated misconduct by Defendant CHIEF

SPAGNOLI, promoting complete lack of morale and accountability among the BPD rank

and file, which has resulted in deprivation of rights to Plaintiff and other detainees and

citizens of the city.   (https://www.bhpdcrisis.com/complaints/;

https://www.foxnews.com/us/female-beverly-hills-police-chief-accused-of-racism-anti-

semitism-amid-2-3-million-settlement; http://sanleandrotalk.voxpublica.org/tag/lawsuits/; S.

Doe v. City of Beverly Hills, et al. Case No. 19STCV00435, LA Superior Court; Rosen v.

City of Beverly Hills, et al. Case No. BC654772, LA Superior Court; Schwartz v. City of

<u>Beverly Hills, et al</u>. Case No. BC708786, LA Superior Court; <u>Moreno et al. v. City of</u>

<u>Beverly Hills, et al.</u> Case No. BC687003, LA Superior Court; <u>Parker v. City of San Leandro</u>

<u>and San Leandro Police Department</u>，  No. HG12642989, Alameda County Superior Court;

<u>McDougall v. Rite Aid Corp., City of San Leandro</u>, HG6754565, Alameda County Superior

Court; <u>Lawrence Williams v. City of San Leandro</u>, USNDC 4:2013cv02302, 14-17389,

Ninth Circuit Court of Appeals.)

(10)     Defendant City, BPD and CHIEF SPAGNOLI failed to do proper background investigations of Defendants under Cal. Gov. Code §1031 before hiring for employment as peace officers.

(11)     Defendant CITY, BPD and CHIEF SPAGNOLI refused to take citizen complaints and adequately discipline individual officers and employees found to have committed similar acts of abuse and misconduct (https://mrcheckpoint.com/a-lawyer-tries-to-file-a-complaint-on-a-police-officer-at-beverly-hills-police-department/);

(12)     Defendant CITY, BPD and CHIEF SPAGNOLI refused to competently and impartially investigate allegations of abuse and misconduct alleged to have been committed by Defendants and other BPD officers;

(13)     Defendant CITY, BPD and CHIEF SPAGNOLI reprimanded, threatened, intimidated, demoted and fired officers who reported acts of abuse by other officers;

(14)     Defendant CITY, BPD and CHIEF SPAGNOLI covered up acts of misconduct and abuse by BPD officers and sanctioned a code of silence by and among officers;

(15)     Defendant CITY, BPD and CHIEF SPAGNOLI rewarded officers who displayed aggressive and abusive behavior towards detainees and arrestees;

(16)     Defendant CITY, BPD and CHIEF SPAGNOLI failed to adequately train and

educate officers in the use of reasonable and proper force and failed to enforce the department's written regulations with respect to uses of force;

(17)     Defendant CITY, BPD and CHIEF SPAGNOLI failed to adequately supervise the actions of officers under their control and guidance;

(18)     Defendant CITY, BPD and CHIEF SPAGNOLI condoned and participated in the practice of prosecuting known groundless criminal charges for the purpose of insulating the City of Beverly Hills, BPD and its officers from civil liability and reducing or dismissing criminal charges against individuals in return for release from civil liability;

(19)     Defendant CITY, BPD and CHIEF SPAGNOLI condones and encourages a conspiracy of silence among its employees for the purpose of concealing and furthering wrongful and illegal conduct by its employees;

(20)     Defendant CITY, BPD and CHIEF SPAGNOLI engaged in the practice and custom of withholding from criminal defendants, judges and prosecutors, known *Brady* evidence favorable to defendants and unfavorable to its officers in violation of law and the Constitution.

(21)     Defendant CITY, BPD and CHIEF SPAGNOLI fostered and encouraged an atmosphere of lawlessness, abuse and misconduct, which by December 10, 2017 and thereafter, represented the unconstitutional policies, practices and customs of the CITY and BPD.

23.     By reason of the aforesaid policies, customs, practices and usages, Plaintiff's rights under the Fourth, and Fourteenth Amendments to the United States Constitution were deprived.

## PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

1.      For General damages according to proof;

2.      For Special damages according to proof;

3.      For Punitive damages as provided by law, in an amount to be proved against each individual Defendant;

4.      For Attorney's fees pursuant to 42 U.S.C § 1988;

5.      For Costs of suit;

6.      For such other and further relief as the Court may deem proper.


DATED:      May 21, 2019              MKRTCHYAN LAW


                              By:      /s/Narine Mkrtchyan
                                       Narine Mkrtchyan
                                       Attorney for Plaintiff

18

## <u>PLAINTIFF'S JURY TRIAL DEMAND</u>

Plaintiff hereby demands trial by jury.

DATED:   May 21, 2019                          MKRTCHYAN LAW

By: /s/Narine Mkrtchyan
Narine Mkrtchyan
Attorney for Plaintiff