# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHEL NAZARIAN,<br>　　　　Plaintiff,<br><br>　　　　　　v.<br><br>CITY OF BEVERLY HILLS, et al.,<br>　　　　Defendants. | CV 19-4391 DSF (Ex)<br><br>Order GRANTING in Part and DENYING in Part Defendants' Motion for Summary Judgment (Dkt. 71) |

This case arose out of a warrantless search of Plaintiff Rachel Nazarian's apartment while police officers held her handcuffed in the hallway. Dkt. 1 (Compl.). Nazarian brought claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, false arrest, and conspiracy to deprive constitutional rights against Officers Stephanie Nguyen-Lieu, Michael Downs, Aaron Mori, Alexander Rhee, and Maraya Contreras (collectively, Officer Defendants). Id. Nazarian also brought a claim for unlawful custom and practice under § 1983 (the Monell claim) against the City of Beverly Hills and Chief Spagnoli (collectively, City Defendants). Id.

Defendants move for an order granting summary judgment or partial summary judgment on Nazarian's complaint. Dkt. 71 (Mot.).[1]

---

[1] The parties were required to meet and confer pursuant to Local Rule 7-3 and the Court's Standing Order. Dkt. 8 at 3. A cursory note that Nazarian's counsel refused to comply is insufficient. Nazarian's counsel's refusal to meet and confer is unacceptable. The parties are reminded that the continued refusal to follow applicable rules will result in sanctions.

Nazarian opposes the Motion.  Dkt. 79 (Opp'n).  This matter is appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

# I. BACKGROUND

On December 10, 2017 around 5 a.m., Maria Inca Arellano called the Beverly Hills Police Department after she heard a woman yelling. Dkt. 79-1 (NDF) ¶¶ 1-2.[2]  Officer Nguyen-Lieu was dispatched to 170 North Crescent Drive to respond.  Id. ¶ 1.  On arrival, Nguyen-Lieu spoke to Inca Arellano, who explained she awoke to a woman screaming as though she was being hurt.  Id. ¶ 2.  Inca Arellano was concerned for the woman's safety.  Id. ¶ 3.  While she was unsure whether the scream originated from her building, Inca Arellano stated it came from somewhere east of her unit.  Id. ¶ 4.  Nguyen-Lieu then went inside but did not hear anything, so she went to the alley behind the building to listen for signs of a disturbance.  Id. ¶ 5.

Around 5:59 a.m., Nguyen-Lieu heard a woman yelling and the sound of glass breaking.  Id. ¶¶ 7-10.  Nguyen-Lieu looked up and saw glass falling and window dressings blowing out of a window.  Id. ¶¶ 9-10.  Nguyen-Lieu requested additional units, drove out of the alley to the front of the building, and ran up to the third floor.  Id. ¶¶ 12, 15-16. While it seemed from the alley that the disturbance was coming from high up in the building, she was unsure if it came from the second or third floor, so she requested units secure the second floor of the building as well.  Id. ¶¶ 17-18.  When she got to the third floor,

---

[2] Citations to NDF refer to Nazarian's Disputed Statement of Facts, dkt. 79-1, which incorporates Defendants' proposed uncontroverted facts and Nazarian's responses to those facts.  To the extent certain facts are not mentioned in this Order, the Court has not relied on those facts in reaching its decision.  To the extent the Court cites to a disputed fact, the Court has found that the dispute was not valid or was irrelevant unless otherwise indicated.

Nguyen-Lieu knocked on the doors of the four south-facing apartments and announced a police presence.  Id. ¶ 20.

Most of the occupants opened their doors quickly, but Nazarian, who resided in unit #307 and was awakened by the loud banging on her door, did not immediately open the door.  Id. ¶¶ 20-23; dkt. 81 (DDF)[3] ¶ 1.  Nazarian, then a 74-year old woman who lived alone, had previously been the victim of an attempted burglary in which the perpetrators masqueraded as the police.  DDF ¶¶ 1-3.  Nazarian went to the door in her nightgown without putting on her glasses and asked who it was.  Id. ¶ 5.  Nazarian heard "police," and responded, "no."  NDF ¶ 31.  This heightened Nguyen-Lieu's concern, as in her experience a refusal to open the door was a "red flag," and she believed someone inside the unit was injured.  Id. ¶¶ 34-35.

After several more requests that Nazarian open the door, Nguyen-Lieu warned that officers would break down the door if Nazarian did not open it.  Id. ¶ 35.  At some point during this exchange, Officers Downs, Mori, and Contreras arrived at Nazarian's apartment.  Id. ¶ 25.  Officer Rhee went to the second floor to listen for signs of a disturbance but left for the third floor when he learned officers were about to force entry into a unit.  Id. ¶¶ 26-27, 41.  Downs then kicked in the door, which hit Nazarian as it fell.  Id. ¶¶ 42-44; DDF ¶¶ 10-13.

The parties dispute what happened next.  Defendants state that several of the Officer Defendants asked Nazarian several times to step out of the apartment.  NDF ¶ 46.  When she refused to move out of the doorway, Mori "grabbed Nazarian by her upper arms" and "removed her from her apartment into the hallway."  Id. ¶¶ 48-49.  Mori then "turned over" supervision of Nazarian to Rhee, who held Nazarian in the hallway, her face to the wall, while the other Officer Defendants searched her apartment.  Id. ¶ 50.  Nazarian made movements in the direction of her apartment and Rhee could not search Nazarian based

---

[3] Citations to DDF refer to Defendants' Response to Nazarian's Separate Statement of Facts, dkt. 81, which incorporates Nazarian's proposed uncontroverted facts and the Defendants' responses to those facts.

on a policy that officers did not search subjects of the opposite sex.  Id. ¶ 54.  As a result, Rhee handcuffed Nazarian "for Officer safety and the safety of Nazarian pending the investigation."  Id.  Rhee asserts he made sure to leave a finger space between the cuffs and Nazarian's wrists.  Id. ¶ 59.

Once the Officer Defendants cleared Nazarian's apartment, they went down to the second floor and located the disturbance.  Id. ¶¶ 62-66.  Downs stayed with Nazarian.  Id. ¶ 63.  The Officer Defendants discovered the disturbance was a woman who was having hallucinations and placed her on a Welfare and Institutions Code section 5150 hold.  Id. ¶¶ 65-66.  Once the hallucinating woman was found, an on-scene supervisor radioed Downs to uncuff Nazarian, which he did.  Id. ¶ 67.  Once released, Nazarian was treated by paramedics and greeted by family members.  Id. ¶¶ 71-72.  Defendants claim Nazarian was in handcuffs for a total of five to six minutes.  Id. ¶ 68.

Nazarian tells a different story.  Nazarian states that as soon as the door was broken down, Mori and Rhee "immediately and aggressively barged in, grabbed and handcuffed Plaintiff by wrenching and pulling on her arm."  DDF ¶ 18.  She was then "torn out of her apartment and thrown on the floor of her apartment complex hallway."  Id. ¶ 19.  Nazarian never resisted and was left sitting on the floor in handcuffs sobbing for as long as twenty minutes, although the Officer Defendants discovered within seconds that her apartment was not the source of the disturbance.  Id. ¶¶ 21, 23, 28.  The handcuffs were tight enough to leave bruises on Nazarian's wrists and she experienced heart palpitations.  Id. ¶¶ 37, 40.  Nazarian received lasting injuries including injuries to her wrists, right hand, shoulder, knee, and foot; loss of hearing in both ears; psychological trauma; and post-traumatic stress disorder.  Id. ¶¶ 42, 45-46.  Nazarian filed a citizen complaint with the Professional Standards Unit (PSU) of the Beverly Hills Police Department through her counsel.  Id. ¶ 48.  The PSU never contacted Nazarian during the investigation; interviewed one neighbor, Nguyen-Lieu, Downs, Rhee, and Mori; and eventually exonerated the Officer Defendants of wrongdoing.  Id. ¶¶ 49-55.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This burden is not a light one." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). But the moving party need not disprove the opposing party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325. If the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial. Id. at 323-24; Fed. R. Civ. P. 56(c)(1). A non-moving party who bears the burden of proof at trial as to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment. See Celotex Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. Id. at 248. "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Summary judgment is improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006)). Instead, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party

opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986) (punctuation omitted).

## III. DISCUSSION

Defendants contend (1) there was no unreasonable search or seizure; (2) the Officer Defendants did not use constitutionally excessive force; (3) Nazarian's detention did not amount to a false arrest; (4) there was no conspiracy to deprive Nazarian of her constitutional rights; (5) the City Defendants do not have a custom, policy, or practice that caused a constitutional violation; and (6) Defendants are entitled to qualified immunity.

## A.   Evidentiary Objections

"A district court's ruling on a motion for summary judgment may only be based on admissible evidence." <u>Oracle</u>, 627 F.3d at 385. A party seeking to admit evidence bears the burden of proof to show its admissibility. <u>Id.</u> Defendants seek to exclude the third-party witness testimony and statements submitted by Nazarian on numerous grounds, including that the statements are hearsay, lack foundation, are based on unsupported assumptions, contain misleading or irrelevant statements, or were elicited through argumentative questioning. Dkt. 83 (Defs. Mem. of Obj.). But "[a]t the summary judgment stage, [the Court does] not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003). Regarding the testimony in question, the witnesses could take the stand at trial and recount what they saw at the apartment. This evidence would be relevant and admissible. The Court has not considered facts that are irrelevant or are based on inadmissible evidence.

Because the evidence could be presented in admissible form at trial, the Court may consider the evidence at the summary judgment stage. <u>Id.</u> at 1037 (citing <u>Hughes v. United States</u>, 953 F.2d 531, 543 (9th Cir. 1992) (holding that an affidavit could be considered on summary judgment despite hearsay and best evidence rule objections

because the facts underlying the affidavit were of the type that would be admissible evidence, even though the affidavit itself might not be admissible); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (ruling that hearsay evidence produced in an affidavit may be considered if the out-of-court declarant could later present the evidence through direct testimony)).  Defendants' objections are overruled.

## B.   Individual Constitutional Violations

The Court analyzes alleged constitutional violations through the lens of qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Qualified immunity is an entitlement not to go to trial, not merely a defense from liability. Saucier v. Katz, 533 U.S. 194, 200 (2001).  It should be decided early in the proceedings.  Id.  Analysis of the qualified immunity defense is a two-prong inquiry.  The court asks whether, on the facts alleged, a constitutional right has been violated.  If no such right has been violated, the plaintiff cannot prevail.  Id. at 200-01.

The Court must also consider whether that right was "clearly established."  "Clearly established" means the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id. at 201 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 201.

A plaintiff bears the initial burden of proving that the rights allegedly violated by defendants were clearly established at the time of the alleged misconduct.  Davis v. Scherer, 468 U.S. 183, 197 (1984); Houghton v. South, 965 F.2d 1532, 1534 (9th Cir. 1992).  Law enforcement officers are charged with knowledge of controlling

Supreme Court and Ninth Circuit precedent.  Hallstrom v. City of Garden City, 991 F.2d 1473, 1482-83 (9th Cir. 1993).  "[T]he proper fact-specific inquiry under Anderson is not whether the law is settled, but whether, in light of clearly established law and the information available to him, a reasonable person in [the defendant's] position could have objectively believed his actions to be proper."  Floyd v. Laws, 929 F.2d 1390, 1394 (9th Cir. 1991) (citing Anderson, 483 U.S. at 641).

### 1.    Unreasonable Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Warrantless searches of the home or the curtilage surrounding the home are "presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980).  To lawfully enter a home without a warrant, there must be either probable cause and exigent circumstances, or an emergency justifying the entry.  United States v. Struckman, 603 F.3d 731, 738 (9th Cir. 2010); see also Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (per curiam).  Nazarian claims the Officer Defendants violated her rights by forcing entry into her home without exigency or an emergency.  Opp'n at 7.

Under the emergency exception to the warrant requirement, police officers may enter a home without a warrant "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  Mahrt v. Beard, 849 F.3d 1164, 1172 (9th Cir. 2017) (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)).  "To determine whether the exception applies, [courts] apply a two-part test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need."  United States v. Guillen, 755 F. App'x 643, 645 (9th Cir. 2018) (quoting United States v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008)) (quotation marks omitted), cert. denied, 139 S. Ct. 2654 (2019).

The emergency exception justified this warrantless entry. Nguyen-Lieu heard a woman yelling and saw glass break. NDF ¶¶ 7-10. It was reasonable to think that someone was in danger of being harmed further or was injured and needed help. See Mahrt, 849 F.3d at 1172 (noting the exigency exception applies to prevent physical harm to officers or others). The 9-1-1 caller corroborated hearing the yelling that prompted the call in the first place and told Nguyen-Lieu it sounded like a woman was screaming as though she was being hurt. NDF ¶¶ 2-4; see Guillen, 755 F. App'x at 645 (upholding a warrantless search where the "officers responded to a 911-caller's report of a man yelling and screaming 'at the top of his lungs' and 'threatening somebody' at 3:40 a.m."). There is no dispute as to these material facts. While a misdemeanor will rarely justify warrantless entry into a home, see Hopkins v. Bonvicino, 573 F.3d 752, 739 (9th Cir. 2009), there were reasonable grounds here to think someone had been injured and needed immediate medical assistance.[4] That Nguyen-Lieu identified the physical disturbance as a misdemeanor when she called for backup does not establish there was no threat of injury. See NDF ¶ 12.

The scope of the search was also reasonable. Though the parties dispute how long the search lasted, the uncontradicted evidence establishes that the search lasted for a maximum of only several minutes. Id. ¶¶ 24, 67. Nguyen-Lieu could have taken the time to locate the right apartment unit on the second floor before going inside the building, which would have avoided this encounter and helped find the victim faster. But the test is not whether the officers responded to a potential emergency in an ideal manner. The test is whether officers had an objectively reasonable belief that there was an injured occupant in the apartment, and whether the scope of the search was reasonable under the circumstances.

---

[4] Defendants attributed a quote that the police may enter a home when they have "the reasonable but mistaken belief that an emergency exists" to Delaware v. Prouse, 440 U.S. 648, 654 (1979) and Snipe, 515 F.3d at 954. Mot. at 17. This quote is from People v. Troyer, 51 Cal.4th 599, 613 (2011).

While Nazarian had no obligation to open the door for the Officer Defendants, see, e.g., Hopkins, 573 F.3d at 765, Nguyen-Lieu's belief that someone was being injured was reasonable.  Nazarian claims that the "law requires the Defendants to articulate specific facts that there was an emergency or exigency to this apartment where Plaintiff resided, not the general emergency to the *building*," Opp'n at 7, but does not provide any citations supporting this claim.  In any event, Nguyen-Lieu did not rely on "a general emergency to the building." Her estimate that the apartment was on the second or third floor of the building was reasonable under the circumstances.  Viewing the case in the light most favorable to Nazarian, it was reasonable for the Officer Defendants to enter Nazarian's apartment without a warrant and conduct a brief search.[5]  Defendants' Motion as to Nazarian's unreasonable search claim is GRANTED.

### 2. Unreasonable Seizure/False Arrest

#### a. Violation of a Constitutional Right

Nazarian claims the Officer Defendants further violated the Fourth Amendment by prolonging her detention to the point that it became a de facto arrest.  Opp'n at 14.  A detention may be unlawful under the Fourth Amendment "either because the detention itself is improper or because it is carried out in an unreasonable manner." Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994).  "A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy."  Id.  "Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns."  Id.

---

[5] It is unfortunate that the door fell on and injured Nazarian when the officers kicked it down, but that does not make the entry unreasonable. Nazarian testified that she heard the police say two or three times that they were going to break down the door and count to three before they kicked it in. NDF ¶ 35-36; Pl.'s Compendium of Ev., Nazarian Dep. at 20:17-24.

A suspect is arrested if a reasonable person in her position would conclude she is not free to leave after brief questioning.  United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990).  The difference between an arrest and a stop is one of degree and depends on the "totality of the circumstances": specifically, the intrusiveness of the stop, how much the plaintiff's liberty was restricted, and the reasonableness of the methods used by the police officers under the circumstances.  Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).  This balancing test weighs the interests of individuals to be free from unreasonable searches and seizures against the legitimate public interest in protecting the safety of the police officers.  See id. at 1187.

Prolonged seizures may be unreasonable if they continue past the point that officers have an interest in detaining the individual.  See Davis v. United States, 854 F.3d 594, 600 (9th Cir. 2017).  Because the Officer Defendants here searched the wrong residence, the reasonableness of the detention turns not only on the amount of time involved, but also on "when a reasonable officer would have known that a serious error had occurred and that the search should be terminated."  Liston v. County of Riverside, 120 F.3d 965, 978 (9th Cir. 1997), as amended (Oct. 9, 1997).

The Court must view the conflicting evidence about the manner and duration of Nazarian's detention in the light most favorable to Nazarian as the non-moving party.  Matsushita, 475 U.S. at 587-88; Chevron Corp., 974 F.2d at 1161.  A reasonable jury accepting Nazarian's version of events – she was immediately handcuffed without resisting and thrown against a wall – could certainly determine that the detention was unreasonable and constituted an arrest.  See Sialoi v. City of San Diego, 823 F.3d 1223, 1233-34 (9th Cir. 2016) (holding that a temporary refusal to raise hands and an initial objection to officers' tactics could not as a matter of law prevent a rational jury from concluding an individual was arrested when he was searched, handcuffed, and put in the back of a police car).

The jury could also find the length of Nazarian's detention to be unreasonable.  Prolonged detention of elderly individuals may raise

additional concerns.  <u>Franklin</u>, 31 F.3d at 876-77.  The Officer
Defendants detained Nazarian for up to twenty minutes after a fifteen
to twenty second sweep of her apartment established it was not the
source of the disturbance.  Dkt. 79-6 (Pl.'s Compendium of Ev., Nguyen-
Lieu Dep.) at 227:9-25; dkt 79-8 (Pl.'s Compendium of Ev., Khorsand
Dep.) at 33:3-34:2.  Once the Officer Defendants swept Nazarian's
apartment and saw her windows were intact, it was clear Nazarian was
not involved in the disturbance.  Nevertheless, the Officer Defendants
did not release her.  Downs inexplicably took custody of Nazarian, who
was still in cuffs, while the other officers went to the second floor.  NDF
¶¶ 62-63.  Given the conflicting evidence, a reasonable jury could
conclude that the Officer Defendants unconstitutionally detained
Nazarian in a manner that amounted to a false arrest.

        b.    <u>Clearly Established Right</u>

In the Officer Defendants' version of events, they may be entitled
to qualified immunity.  When an individual is seized at the beginning of
a situation, the officers are "not required to periodically reassess
whether the exigency persisted throughout the standoff."  <u>Fisher v. City
of San Jose</u>, 558 F.3d 1069, 1077 (9th Cir. 2009).  Moreover, officers
may briefly detain a witness for a search with "an articulable basis for
suspecting criminal activity."  <u>See</u> <u>Michigan v. Summers</u>, 452 US 692,
699 (1981).  In Nazarian's version of events, however, the Officer
Defendants are not entitled to qualified immunity.  Nazarian claims
not just that she was detained immediately without being asked to step
out of her apartment,[6] but also that she was detained for up to twenty
minutes after the Officer Defendants established her apartment was
not the source of the disturbance.  NDF ¶ 28.

It is well established that officers may not detain individuals past
the time it becomes clear the officers have detained the wrong person.
Nazarian points to <u>Liston v. County of Riverside</u> to support that

---

[6] As discussed below, the manner of Nazarian's detention may also be
unreasonable if she was not asked to step out of her apartment and did not
resist.  <u>See</u> <u>infra</u> Section III.B.3.

"[u]nder these circumstances the detention was prolonged and constituted a de facto arrest."  Opp'n at 14.  In <u>Liston</u>, the Ninth Circuit stated:

> The warrant authorized a search of 8293 Saddlecreek Drive not because of anything inherent in the house itself, but because James Hill resided there and therefore probable cause existed to believe that contraband and evidence would be found on the premises. However, at some point during the search, the officers became aware they had seized Liston rather than Hill and that Hill no longer owned or occupied the house.  At the moment that the degree of certainty reached such a level that a reasonable officer would have realized these facts, continued detention of the Listons became unlawful and a reasonable officer could not reasonably have believed that further detention was proper.

120 F.3d at 978.  <u>Liston</u> is not factually identical.  There the officers detained the occupants of a house while executing a warrant to search for drug paraphernalia.  <u>See id.</u> at 969.  But the suspect had moved and the officers unknowingly detained an unrelated family who had just moved into the house.  <u>See id.</u> at 968.  Moreover, the Listons were detained for approximately an hour and a half – substantially longer than in this situation.  <u>Id.</u>

The facts are not identical, but courts "do not require a case directly on point, [only] existing precedent [that has] placed the statutory or constitutional question beyond debate."  <u>Jessop v. City of Fresno</u>, 936 F.3d 937, 940 (9th Cir. 2019), <u>cert. denied sub nom.</u> <u>Jessop v. City of Fresno, California</u>, 140 S. Ct. 2793 (2020) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)).  Here there are substantial similarities.  Nazarian claims the Officer Defendants yelled "shut up" before she could explain anything.  DDF ¶ 5; <u>Liston</u>, 120 F.3d at 978.  She also claims neighbors told the Officer Defendants "it is the wrong person," DDF ¶ 7, similar to one of the Listons yelling "you have the wrong house," <u>Liston</u>, 120 F.3d at 978.  Most importantly, the officers in <u>Liston</u> continued to detain the Listons past "the moment that the degree of certainty reached such a level that a reasonable officer would

13

have realized [he had detained the wrong people]." <u>Liston</u>, 120 F.3d at 978.  Similarly, the Officer Defendants continued to detain Nazarian past the point of certainty that they had the wrong apartment, DDF ¶ 23, meaning past the time "a reasonable officer could not reasonably have believed that further detention was proper." <u>Liston</u>, 120 F.3d at 978.

While the Listons were detained for substantially longer than Nazarian, there are cases establishing that "[a]lthough twenty minutes is not an exceedingly long time, it is certainly long enough to transform a stop into an arrest." <u>Ward v. Gates</u>, 52 F. App'x 341, 343 (9th Cir. 2002) (quoting <u>United States v. Chamberlin</u>, 644 F.2d 1262, 1267 (9th Cir. 1980) (finding that holding suspect for 20 minutes constituted an arrest)).  It is also clearly established that prolonged detention of elderly individuals may raise additional concerns.  <u>Franklin</u>, 31 F.3d at 876-77.  The state of the law, therefore, provided "fair warning" to the Officer Defendants that they could not reasonably detain Nazarian once they realized they had the wrong apartment.  <u>Tolan v. Cotton</u>, 572 U.S. 650, 656 (2014) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)); <u>see also</u> <u>Mena v. City of Simi Valley</u>, 226 F.3d 1031, 1040-41 (9th Cir. 2000).  Viewing the evidence in the light most favorable to Nazarian, she has established that her allegedly violated rights were clearly established.  <u>Alston v. Read</u>, 663 F.3d 1094, 1098 (9th Cir. 2011).  Defendants' Motion as to Nazarian's false arrest or unreasonable detention claim is therefore DENIED.

### 3.   **Excessive Force**

#### a.   <u>Violation of a Constitutional Right</u>

Nazarian alleges the Officer Defendants used excessive force in violation of the Fourth Amendment by handcuffing her, dragging her out of her apartment, and throwing her onto the hallway floor.  Opp'n at 13.  Police may only use force that is objectively reasonable under the circumstances.  <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989).  To determine if the force used was reasonable, a court "must balance 'the nature and quality of the intrusion on an individual's Fourth

Amendment interests' against the countervailing governmental interests at stake." Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010) (quoting Graham, 490 U.S. at 396). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and includes "allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97.

The Court first considers the type and amount of force used on Nazarian. Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001). Again, the parties' accounts differ. In Defendants' retelling, Mori guided Nazarian into the hallway after the Officer Defendants asked Nazarian multiple times to step out into the hallway. NDF ¶¶ 46, 48-49. Rhee cuffed Nazarian for her own and officers' safety, and Downs released Nazarian as soon as the disturbance was located. Id. ¶¶ 54, 59, 65-68. Some Officer Defendants said no force at all was used. Dkt. 79-14 (Pl.'s Compendium of Ev., Mori Dep.) at 183:15-19; Pl.'s Compendium of Ev., Nguyen-Lieu Dep. at 259:17-218:6.

But Nazarian's story is different, and the Court must view the evidence in the light most favorable to Nazarian. Matsushita, 475 U.S. at 587-88; Chevron Corp., 974 F.2d at 1161. Nazarian claims the Officer Defendants knocked down her door and then the following happened: (1) Mori and Rhee immediately and aggressively handcuffed her by "wrenching and pulling her arm," DDF ¶ 18; (2) the Officer Defendants "tor[e her] out of her apartment," id. ¶ 19; and (3) the Officer Defendants threw her on the floor or against the wall of her apartment hallway, where she was left sobbing for twenty minutes without resisting, id. ¶ 19, 21, 25, 27; dkt. 79-9 (Pl.'s Compendium of Ev., Klein Dep.) at 14:21-15:2.

At least three neighbors support parts of this version of events. Jeffrey Klein stated, "I saw them basically rip her out of the unit, and then I think what – well I didn't see whether it was metal handcuffs or a pair of zip ties, whatever it was, but they bound her hands and then basically just tossed her against the wall." Pl.'s Compendium of Ev.,

Klein Dep. at 14:21-15:2.  He did not see her attempt to get up from her seated position to resist and did not think she would have been physically able to stand up and resist.  Id. at 30:6-14.  He saw bruises on her wrists after the encounter.  Id. at 23:10-19.  Hedieh Khorsand saw Nazarian sitting hunched on the floor with her hands behind her back, sobbing, for twenty minutes.  Pl.'s Compendium of Ev., Khorsand Dep. at 33:3-34:2.  Mirielle Bertagna saw Nazarian sitting on the floor not resisting for five to ten minutes and confirmed her wrists were bruised afterwards.  Dkt. 79-10 (Pl.'s Compendium of Ev., Bertagna Dep.) at 14:15-15:8, 15:17-20, 16:21-24.[7]

The Court next determines whether a strong government interest compelled the force, and then balances the force used against the need for force.  Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).  The Court considers the factors identified in Graham: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  This must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  The most important factor under Graham is whether the suspect posed an immediate threat to the safety of the officers or others.  Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994)).

Police officers have an interest in protecting their own and others' safety, which includes controlling "'rapidly evolving' and escalating" situations.  Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001).  That often requires putting individuals in handcuffs, or using force to control resisting individuals, especially when they have not

---

[7] Defendants object to portions of Klein's, Khorsand's, and Bertagna's testimony on relevance grounds and to Nazarian's description of their testimony on the basis that Nazarian misstated the cited evidence.  DDF ¶¶ 19-20; Defs.' Mem. of Obj. at 17-19.  These objections are overruled.  The testimony is relevant, and the Court has examined Klein's, Khorsand's, and Bertagna's testimony to ensure it is accurately stated.

been searched as was the case here.  See Tatum v. City & Cty. of S.F., 441 F.3d 1090, 1097-98 (9th Cir. 2006) ("it was objectively reasonable for [the officer] to use a control hold to secure [the individual's] arm long enough to place him in handcuffs").  The Officer Defendants had an interest in finding and helping the woman who yelled.  They also had an interest in keeping themselves safe while doing a protective sweep of Nazarian's apartment.

But given the conflicting evidence, a reasonable jury could easily conclude the Officer Defendants violated Nazarian's Fourth Amendment rights by immediately handcuffing her and throwing her against a wall when she posed no significant threat to the officers or others.  Nor do the other Graham factors justify the degree of force allegedly used.  While the sounds of yelling and glass breaking could indicate a threat to one's safety, Nazarian was not resisting or attempting to evade arrest in her version of events.  NDF ¶¶ 7-10, 14, 21.  Taking Nazarian's allegations as true, any force used by the Officer Defendants against Nazarian would be excessive – as no force was required.  See Headwaters Forest Def. v. Cty. of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000) ("[W]here there is no need for force, *any* force used is constitutionally unreasonable."), vacated and remanded on other grounds, 534 U.S. 801 (2001).

Although there are no allegations that Nguyen-Lieu or Contreras pulled Nazarian from her apartment or held her in handcuffs, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), rev'd on other grounds, 518 U.S. 81 (1996) ("Because the third-party actors were officers attempting to make an arrest, [defendant's] duties to the custodial subject were to protect against only such force as was unreasonable").  "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede."  Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000), as amended (Oct. 31, 2000).

Nazarian presented evidence that Nguyen-Lieu and Contreras were present when the force was used.  See, e.g., Pl.'s Compendium of

Ev., Nguyen-Lieu Dep. at 227:18-228:5; dkt. 79-13 at 22:2-24:14. Similarly, even if Downs did not physically grab or throw Nazarian, he was present.  Pl.'s Compendium of Ev., Nguyen-Lieu Dep. at 227:18-228:5.  A reasonable jury could find, given the factual dispute, that Nguyen-Lieu, Contreras, and Downs had an opportunity to intercede if Mori and Rhee were violating Nazarian's constitutional rights.

"Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [courts] have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  Santos, 287 F.3d at 853.  There is a triable issue as to the reasonableness of the Officer Defendants' use of force. Therefore, the Court cannot conclude as a matter of law that the Officer Defendants did not violate the Fourth Amendment.

b.   Clearly Established Right

Refusing to open a door, on its own, is not resisting.  See Hopkins, 573 F.3d at 765 ("The mere fact that Hopkins did not answer the door cannot tip the balance in the officers' favor, since nothing requires an individual to answer the door in response to a police officer's knocking." (citing United States v. Washington, 387 F.3d 1060, 1070-71 (9th Cir. 2004))).  At the time of these events, any reasonable officer in the Officer Defendants' positions would have known that it was excessive to handcuff a seventy-four-year-old, five-foot tall woman who has not yet been asked to step out of her apartment, throw her against a wall, and leave her sitting on the floor.

And it is well established that unreasonably tight handcuffing can violate the Fourth Amendment.  Liiv v. City of Coeur D'Alene, 130 F. App'x 848, 852 (9th Cir. 2005) (collecting cases).  Nazarian alleges she said "Ow! It's hurting!" as Mori and Rhee handcuffed her and pulled her into the hallway, and she had bruises on her wrists afterwards.  Pl.'s Compendium of Ev., Nazarian Dep. at 26:21-27:2. While the Officer Defendants describe a very different use of force and were reacting to a potentially dangerous and rapidly evolving situation,

the force – as Nazarian describes it – was clearly established as unconstitutional.  The Officer Defendants are not entitled to qualified immunity on the facts as Nazarian describes them.  Defendants' Motion as to Nazarian's excessive force claim is DENIED.

### 4.   Conspiracy

"A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999).  To prove a civil conspiracy, the plaintiff must show that the parties "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."  Lacey v. Maricopa County, 693 F.3d 896, 935 (9th Cir. 2012).  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989).  "A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions."  Lacey, 693 F.3d at 935.

Defendants devote half a page to Nazarian's conspiracy claim in their Motion, stating simply, "Plaintiff has produced no evidence suggesting that the City's Police Officers or retired Chief of Police Sandra Spagnoli[8] engaged in a coordinated action to deprive Plaintiff of her constitutional rights.  Bald assertions of a 'meeting of the minds' is insufficient to support a conspiracy claim as a matter of law."  Mot. at 24-25.  Two cursory statements that Nazarian has not produced any evidence supporting conspiracy is not sufficient to meet the burden of "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  Courts need not "manufacture arguments for a[]

---

[8] As she notes in her Opposition, Nazarian brings claims against Spagnoli only for the purposes of Monell liability, not conspiracy.  Opp'n at 16 n.1.

[party]."  Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009); see also Indep. Towers of Wash. v. Washington, 350 F.3d 925, 929-30 (9th Cir. 2003) ("However much we may importune lawyers to be brief and to get to the point, we have never suggested that they skip the substance of their argument in order to do so. . . . We require contentions to be accompanied by reasons."); Mahaffey v. Ramos, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

### a.   Unreasonable Detention and Excessive Force

In any event, Nazarian has produced evidence from which a reasonable jury could find a conspiracy to use excessive force and unreasonably detain Nazarian.[9]  Nazarian alleges that all of the Officer Defendants are implicated in the excessive force and prolonged detention claims "because each had either intricate participation in the requisite acts or failed to intervene with knowledge of facts."  Opp'n at 15-16.  This is not just a "bald assertion," but is instead supported by specific facts.

To support the excessive force conspiracy, Nazarian argues that the Officer Defendants were aware of "Plaintiff being removed from her apartment in handcuffs in the manner she was removed and thrown to sit there" but did nothing to stop "these unconstitutionally excessive actions."  Opp'n at 22 (citing DDF ¶¶ 25, 30).  To support the unreasonable seizure conspiracy, Nazarian states "none of the Defendants even attempted to uncuff or signal their colleagues to uncuff Plaintiff as soon as they learned within seconds they were in the wrong apartment."  Opp'n at 20 (citing DDF ¶¶ 23, 26, 27, 30).

"Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus

---

[9] Because Nazarian's unreasonable search claim failed, the Court does not address the conspiracy to conduct an unreasonable search.

reached a [sic] understanding to achieve the conspiracy's objectives."
Mendocino Env't Ctr. v. Mendocino County, 192 F. 3d 1283, 1301-02
(9th Cir. 1999) (quoting Hampton v. Hanrahan, 600 F. 2d 600, 621 (7th
Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980) (internal
quotation marks omitted)).  As noted previously, "police officers have a
duty to intercede when their fellow officers violate the constitutional
rights of a suspect or other citizen."  Koon, 34 F.3d at 1447 n.25.  The
Court cannot conclude that Nazarian failed to provide disputed facts
that could lead a reasonable jury to find the Officer Defendants did not
intervene when their fellow officers used excessive force or
unreasonably detained Nazarian.  See supra Sections III.B.1, III.B.2.
The failure to intervene could be considered circumstantial evidence
that the Officer Defendants "'reached a unity of purpose or a common
design and understanding, or a meeting of the minds in an unlawful
arrangement'" to violate Nazarian's Fourth Amendment rights.  Lacey,
693 F.3d at 935.

Nazarian further supports her conspiracy claim by alleging the
Officer Defendants "corroborated each other's version of events on key
points that [were] known to be false" in reports and depositions after
the fact.  Opp'n at 20 (citing DDF ¶¶ 47, 53-55).  Viewing the evidence
in the light most favorable to Nazarian, filing false reports after the
fact could strengthen the evidence of an agreement to violate
Nazarian's rights at the time.  While the Officer Defendants had little
time together at the scene before the alleged force was used on
Nazarian, Nazarian need not prove that the Officer Defendants knew
specific details of what might unfold, but instead "at least share[d] the
common objective of the conspiracy."  United Steelworkers, 865 F.2d at
1541.

Drawing all inferences in Nazarian's favor, there is a possibility
that a jury could infer a conspiracy from the circumstances.  "A court
evaluating a summary judgment motion must consider all 'justifiable'
and 'legitimate' inferences in the nonmoving party's favor."  United
Steelworkers, 865 F.2d at 1545 (quoting Matsushita Elec. v. Zenith
Radio, 475 U.S. 574, 587-88 (1986).  As noted above, the Officer
Defendants are not entitled to qualified immunity on the excessive

force or unreasonable seizure claims.  They are therefore also not entitled to qualified immunity on the related conspiracy claim. Defendants' Motion as to Nazarian's conspiracy claims regarding excessive force and unreasonable seizure is DENIED.

   b. <u>Cover-Up</u>

  Nazarian also alleges a conspiracy to cover up the constitutional violations after the fact.  <u>See</u> Opp'n at 20-22.  Specifically, Nazarian states Nguyen-Lieu and Rhee filed false case reports.  <u>See</u> <u>id.</u>  Further, all the Officer Defendants "have covered each other on key points" in statements to superiors and depositions in line with the "long-standing code of silence among law enforcement."  <u>Id.</u> at 21.  Allegations that a defendant participated in a cover-up only constitute a § 1983 claim if the cover-up deprived the plaintiff of the right of access to the courts.  <u>See</u> <u>Delew v. Wagner</u>, 143 F.3d 1219, 1222-23 (9th Cir. 1998); <u>Karim-Panahi v. Los Angeles Police Dep't</u>, 839 F.2d 621, 625 (9th Cir. 1988).  A valid § 1983 cover-up claim requires that the conspiracy prevented the plaintiff from obtaining redress for the violation that was the subject of the cover-up.  <u>See</u> <u>id.</u>  In other words, a plaintiff must allege that the cover-up actually precluded the individual from prevailing in a state or federal lawsuit against the wrongdoers.  <u>Delew</u>, 143 F.3d at 1222-23.  Thus, a cover-up claim is premature when, as here, the plaintiff's action seeking redress for the underlying violations remains pending.  <u>See</u> <u>id.</u>; <u>Karim-Panahi</u>, 839 F.2d at 625 (claim alleging police cover-up of misconduct was premature when action challenging misconduct was pending).

  Nazarian claims that filing a false police report is a crime under California law, which is sufficient to prove a conspiracy.  Opp'n at 20-21.  But it is not sufficient to prove a conspiracy to deprive Nazarian *of a constitutional right* under § 1983 if there has been no deprivation of a constitutional right.  <u>Dickerson v. Williams</u>, 29 F.3d 631 (9th Cir. 1994).  Filing a false police report on its own does not deprive Nazarian of any constitutional rights.  <u>See</u> <u>Hutchinson v. Grant</u>, 796 F.2d 288, 291 (9th Cir. 1986) (rejecting a theory that a town was liable under the civil rights conspiracy statute based on an alleged cover-up because the

claim could not rest on police activity after the arrest occurred); <u>Dooley v. Reiss</u>, 736 F.2d 1392, 1394-95 (9th Cir. 1984) (affirming dismissal of a § 1983 action alleging police cover-up where the plaintiffs had in fact succeeded in obtaining redress for the illegal police conduct in a prior § 1983 action), <u>cert. denied</u>, 469 U.S. 1038 (1984).  Therefore, Defendants' Motion as to the conspiracy claim based on a cover-up is GRANTED.

## C.   <u>Monell</u> Claim

Nazarian asserts a claim for "Municipal Liability for Unconstitutional Custom, Practice, or Policy."  Compl. at 1.  There is no vicarious liability under § 1983, <u>Monell v. N.Y. Dep't. of Soc. Serv.</u>, 436 U.S. 658, 694 (1978), but a local governmental entity may still be liable under § 1983 if a plaintiff can prove "(1) [the plaintiff] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation."  <u>Lockett v. County of Los Angeles</u>, 977 F.3d 737, 738 (9th Cir. 2020).  A plaintiff must prove the municipal policy was the "direct causal link between the municipal action and the deprivation of federal rights."  <u>Board of Cty. Comm'rs v. Brown</u>, 520 U.S. 397, 404 (1997).

### a.   <u>Code of Silence</u>

Nazarian's first theory to support her <u>Monell</u> claim is the "City and its police department promote and have historically promoted the code of silence that enables officers, including the named parties in this case, to falsify the true version of events, use excessive force in detention and fail to report the use of force to their superiors."  Opp'n at 26.

A policy within the meaning of <u>Monell</u> exists where official policymakers "consciously" choose a particular course of action or procedure "from among various alternatives."  <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985); <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986) (plurality opinion) ("municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a

23

course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question").  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).  However, the Ninth Circuit has applied Monell to single-incident cases where the policy or absence of a policy was so "deliberately indifferent" as to constitute a constitutional violation in itself.  Christie v. Iopa, 176 F.3d 1231, 1240-41 (9th Cir. 1999).

Defendants argue there is no evidence Defendants had a "'policy or custom' which caused the alleged constitutional injuries suffered by Plaintiff."  Mot. at 28.  Defendants also argue "this single event is not sufficient as a matter of law to establish a custom, policy or practice."[10] Reply at 11.  Defendants are correct.  Nazarian acknowledges Defendants have a policy requiring the report of uses of force.  DDF ¶ 47.  "Absent a formal governmental policy, [Nazarian] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'"  Trevino, 99 F.3d

_____

[10] Defendants claim Nazarian supports her "code of silence" claim by "by showing that the officers ignored the neighbors' warnings that they were at the wrong apartment and that they knew they were at the wrong apartment before they forced entry."  Reply at 11.  But Nazarian's argument is quite different – she alleges Defendants "failed to report the use of force to their superiors, falsified reports to give appearance of justification for their actions, corroborated each other in all material respects, and perjured themselves at depositions with no fear or remorse."  Opp'n 26-27.  It is unclear how ignoring the neighbors' warnings would relate at all to a code of silence.  While Defendants' argument is off-base and cursory, they have met their burden of "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case," Celotex, 477 U.S. at 325, in pointing to the absence of evidence demonstrating a policy or custom.

at 918 (quoting <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348 (9th Cir. 1992)).

Nazarian argues the Defendants and other officers involved in this event covered up the true facts of the situation with Nazarian, such as failing to report their use of force and falsifying reports for their supervisors.  Opp'n at 26.  Because of this "internal culture" and "standard operating procedure" of the code of silence, Defendants were permitted to "engage in these activities and knew there would be no repercussion."  <u>Id.</u>  But Nazarian does not offer any evidence to establish or even suggest a code of silence outside this one event.

In other words, there is no evidence indicating the failure to report excessive force or code of silence was more than a "sporadic incident" or that it was "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  <u>Trevino</u>, 99 F.3d at 918; <u>see also</u> <u>Meehan v. Los Angeles County</u>, 856 F.2d 102 (9th Cir. 1988) (two incidents not sufficient to establish custom); <u>Davis v. Ellensburg</u>, 869 F.2d 1230 (9th Cir. 1989) (manner of one arrest insufficient to establish policy).  While the investigation of Nazarian's complaint spanned months and involved several officers, the only inference that can be drawn is that the Officer Defendants did not accurately report events.  There is no evidence any other officer involved in the investigation knew about the use of force and did not report it – only that they "uncritically" took down Officer Defendants' statements and did not investigate the claim adequately, DDF ¶¶ 52-54, which is unrelated to the presence or absence of a code of silence.

Nazarian did not produce evidence of "repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded" or any evidence supporting a code of silence outside of this one incident with Nazarian.  <u>Gillette</u>, 979 F.2d at 1349; <u>see also</u> <u>Doe v. City of San Diego</u>, 35 F. Supp. 3d 1233, 1240 (S.D. Cal. 2014) (denying summary judgment when the plaintiff supported a code of silence claim with (1) evidence of an officers' past tenure with the police department, which consisted of numerous bad acts that went

undocumented and undisciplined; (2) testimony from officers acknowledging the code of silence; and (3) expert testimony opining as to the existence and scope of the code of silence).  "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom."  Trevino, 99 F.3d at 920.  Nazarian's evidence falls short of suggesting a custom that is so "persistent and widespread" that it constitutes a "permanent and well settled city policy."  Monell, 436 U.S. at 691.

Construing the facts and all reasonable inferences in Nazarian's favor, she has failed to present any evidence suggesting there was a code of silence that caused her constitutional injury.  Summary judgment as to the Monell claim on the basis of a code of silence is GRANTED.

### b.   Failure to Supervise/Ratification

Nazarian also asserts that "the City fails to properly supervise these Defendants and that its hands-off policy and practice led directly to the violation of Plaintiff's rights."  Opp'n at 27.  Citing the delay in the internal investigation, failure to interview neighbors after the fact, failure to include a neighbor's interview in the report, violation of the personnel complaint investigation policy, and exoneration of the Officer Defendants, Nazarian argues that "Captain Lincoln Hoshino acting on behalf of the Chief Spagnoli approved this disposition by the Professional Standards Unit. . . . Chief Spagnoli as the final policy-maker for the Department did not make any changes or amendments to this action by Hoshino. . . .  Thus the City has ratified all actions by these Defendants and is liable under that theory alone."  Id. (internal citations omitted).

In response, Defendants argue Sergeant Olson's failure to "interview the neighbors in the after-the-fact investigation he conducted into Plaintiff's complaint and Lt. Hoshino's approval of the Professional Standards Unit's disposition of the investigation exonerating the Defendant officers" do not establish that Spagnoli was

the final policy-maker for the Department.  Reply at 11-12.  Further, Defendants posit Nazarian's "claim that the unconstitutional actions of the Defendant officers was ratified by the City is not supported by evidence but is based solely on supposition and argument."  Id. at 12.

A local government may be held liable under § 1983 when "the individual who committed the constitutional tort was an official with final policy-making authority" or such an official "ratified a subordinate's unconstitutional decision or action and the basis for it."  Gillette, 979 F.2d at 1346-47 (internal quotation marks and citations omitted); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123-24, 127.  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  Praprotnik, 485 U.S. at 127.  "There must, however, be evidence of a conscious, affirmative choice" on the part of the authorized policymaker.  Gillette, 979 F.2d at 1347.  A local government can be held liable under § 1983 "only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Id. (quoting Pembaur, 475 U.S. at 483-84 (plurality opinion)).

Defendants correctly state that there is no evidence Spagnoli "made a conscious, affirmative choice to approve [the Officer Defendants'] actions and adopt them as official policy."[11]  Clouthier v.

---

[11] Because Nazarian has not introduced evidence demonstrating Spagnoli made a conscious affirmative choice to ratify the Officer Defendants' use of force, the Court need not address whether Nazarian has introduced sufficient evidence to establish Spagnoli was the official policymaker, although it does not appear that she has.  Contrary to Nazarian's assertion, Spagnoli did not admit in her deposition that she was the final policymaker for the Department.  DDF ¶ 56.  Nazarian alleges Spagnoli "had the responsibility of overseeing the functions of the PSU and delegated task for the Internal Affairs dispositions to the Captains," id., but none of those responsibilities include making policy.

County of Contra Costa, 591 F.3d 1232, 1253 (9th Cir. 2010), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016).  Nazarian claims "Lieutenant Albanese and Captain Hoshino, acting on behalf of the Chief of Police, approved of the disposition made by the PSU, effectively ratifying the conduct of these Defendants."  DDF ¶ 55.

But an individual acting on Spagnoli's behalf does demonstrate a "conscious, affirmative choice" on the part of the authorized policymaker and "[t]o hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law [creating an] end run around Monell."  Gillette, 979 F.2d at 1348.  By definition, another individual doing something on one's behalf is not conscious or affirmative.  Nazarian's evidence does not establish that a policymaker approved a subordinate's decision "*and the basis for it*."  Id.

Nazarian cites Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998) to support her claim.  In Watkins, the Ninth Circuit affirmed the denial of qualified immunity for a police chief who signed an internal affairs report dismissing a plaintiff's complaint despite evidence of the officer's use of excessive force in the report and evidence of the officer's involvement in other similar situations.  That case is distinguishable, as the report contained evidence of the officers' involvement in other similar instances.  Here, there is no evidence that Spagnoli knew of any other use of force incidents.  Most importantly, the police chief actively approved of the report there; others approved of the report on Spagnoli's behalf here.  Summary judgment as to the Monell claim on the basis of ratification or failure to supervise after the incident is GRANTED.

c.    Hiring

Nazarian argues "the City has also failed to do proper background investigation [sic] into Defendant Sandra Spagnoli under California Government Code Section 1031(d) and/or ignored the known

record history, which has directly resulted in the deprivation of Plaintiff's rights, in that it created an atmosphere of lawlessness and impunity at the Department.  Prior to her hire by the City, Chief Spagnoli personally had a scandalous history of civil rights lawsuits and public disapproval as a Chief of San Leandro Police, which was described in detail by a local activist and college professor, Cynthia Chandler. (SS Fact 56)."  Opp'n at 28.

Defendants first respond that Nazarian's "claim that the City did not investigate Chief Spagnoli's past prior to hiring her is supported solely by objectionable, inadmissible evidence, speculation and innuendo."  Reply at 12.  Second, Defendants argue that Nazarian "fails to provide any facts to establish a connection between the City's hiring of Chief Spagnoli and the events giving rise to this incident."  Id.

A municipality may be liable for the hiring of an individual.  See Brown, 520 U.S. at 411-12.  A finding of culpability, however, "simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury.  Rather, it must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff.  The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong."  Id.  To support her claim, Nazarian provides (1) a trial transcript in which Spagnoli admits to being reprimanded for inappropriate behavior and comments; (2) the declaration of Cynthia Chandler, an "adjunct professor at Berkeley School and Director of the Bay Area Legal Incubator;" (3) news articles describing Spagnoli's retirement after a string of employment settlements that totaled $8 million; and (4) a collection of lawsuits against Spagnoli, largely for employment violations.  See dkt. 79-22 (Monell Evidence).

The Court agrees with Defendants that Nazarian's claim of an inadequate background investigation is not supported by any evidence.  Reply at 12.  The trial transcript appears to relate to Spagnoli's time with the Beverly Hills Police Department, and therefore is not relevant to her hiring.  See Monell Evidence at P0001-P0007.  The declaration of

Cynthia Chandler contains accusations against Spagnoli during her tenure as police chief of San Leandro, such as her public comments were racist, she verbally assaulted Chandler's character, she attempted to manipulate the memories of key witnesses, she backed a budget proposal to put more police officers in schools, and similar accusations. See Monell Evidence at P0008-P0015.  None of these accusations comes close to suggesting the individuals hiring Spagnoli would have any notice that she would foster a code of silence in her department, or that she would ratify officers' use of excessive force or unreasonable detention.  Defendants' relevance objection, DDF ¶ 56, is sustained.[12]

The articles about Spagnoli and lawsuits against her appear to be based almost entirely on employment disputes.  See Monell Evidence at P0016-P0073.  This evidence is not relevant.  While the evidence may indicate there was racism and harassment towards employees of the Beverly Hills Police Department, there is no indication Spagnoli enabled a culture of silence at previous jobs, or condoned use of excessive force and unreasonable detention in the past.  In other words, there is no evidence hiring officials knew "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."  Brown, 520 U.S. at 411-12.  Nazarian included a few caption pages relating to issues like false imprisonment and violations of civil rights, see, e.g., id. at P0050, P0066, but there is no information about the lawsuits other than that to demonstrate Spagnoli was accused of similar

---

[12] Federal Rule of Evidence 702 permits opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education" if such testimony will assist the trier of fact and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The majority of Chandler's declaration appears to be based on her anecdotal observations of Spagnoli at speaking events and generalized impressions of the "residents of the City of San Leandro."  The Court does not reach this issue because the declaration is irrelevant, as noted above, but Chandler also likely would not meet the standards for an expert witness articulated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

constitutional violations in the past.  Therefore, summary judgment as to the <u>Monell</u> claim as to the failure to do an adequate background investigation is GRANTED.

### D.    Punitive Damages

Nazarian requests punitive damages from all individual Defendants.  "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).  A reasonable jury could find that Nazarian is entitled to punitive damages from the Officer Defendants.  Viewing the facts in the light most favorable to Nazarian, the Officer Defendants handcuffed her, threw her against a wall, and left her sobbing on the floor in handcuffs without any justification.  Summary judgment as to punitive damages is DENIED.

## IV. CONCLUSION

Defendants' Motion for summary judgment is GRANTED in part and DENIED in part.  Judgment is GRANTED on the First Cause of Action to the extent it alleges a claim for unreasonable search and to the extent it alleges a claim for conspiracy to cover up the incident.  Judgment is also GRANTED on the Second Cause of Action.

IT IS SO ORDERED.

Date: November 18, 2020

Dale S. Fischer
United States District Judge